### DAWSON v. MATLOCK.

No. 18890. Opinion Filed Feb. 19, 1929.

Withdrawn, Corrected, and Refiled, and Rehearing Denied May 14, 1929.

H. Tom Kight, for plaintiff in error.

Frank Ertell, for defendant in error.

LEACH, C. This action was commenced in the county court of Rogers county by K. M. Matlock, the defendant in error, who will hereinafter be referred to as the plaintiff, against George Dawson, to recover a commission for services rendered as a real estate broker, it being alleged by plaintiff in his petition that he was engaged in the business of a real estate broker and agent; that the defendant, Dawson, employed him to find a purchaser for land owned by defendant; that he did find a purchaser therefor in the person of B. F. Glover, whereby defendant was able to sell the land to such purchaser for the sum of $5,100: that there was no agreement between them as to the amount of commission plaintiff should receive for his service, but that five per cent. of the sale price is the customary commission paid real estate brokers for such service, and prayed judgment upon that basis.

The defendant answered admitting ownership of the land, but specifically denied he ever discussed with plaintiff the finding of a purchaser for the land; alleged he was unaware that plaintiff was engaged in the real estate business; and that at no time did he list his property with plaintiff or authorize him to find a purchaser therefor.

Upon trial of the cause verdict and judgment were rendered in favor of plaintiff

for $175, and defendant brings this appeal and complains of the action of the trial court in overruling his demurrer to plaintiff's evidence, and asserts the evidence is insufficient to sustain the verdict and judgment. Under such contention we are required to review the evidence to see if there is any evidence reasonably tending to support the verdict. The material parts of plaintiff's evidence in support of his allegations were in substance as follows:

Plaintiff, after stating his name and giving his residence as Claremore, Okla., testified:

"Q. What is your business? A. Well, I run a rooming house and handle real estate. Q. The Windsor Hotel? A. Yes. Q. Handle real estate in connection with that? A. I handle that on the side. Q. How long have you been engaged in the real estate business? A. Four years. Q. Do you know George Dawson, defendant in this case? A. Yes. Q. You are seeking here to collect commission for selling real estate for him? Tell the jury in your own way how you became engaged in this transaction with him. A. Well, Mr. Glover wanted to buy a place. Q. He was looking around for him a place and you knew he was in the market for a place? A. Yes, I contracted one for him; didn't go through. Q. Where did you meet Dawson? A. On the corner of Wilson's Hardware. Q. You had heard he had some land on the market? A. Yes, I went up to him and says, 'Would you sell your place out there.' and he said, 'Yes, I would sell anything I have but the old lady,' something to that effect. I said. 'I believe I can furnish you a buyer:' he said he would take $100 an acre for it. Q. You told him you would furnish a buyer if the price was all right? A. Yes, that was the conversation between me and Mr. Dawson at that time, he told me to bring the man out. A few days after that, me and Mr. Glover went out there and he came out where we was and said, 'No use introducing us; I know him; didn't think about him wanting to buy a place.' Q. You walked out there together? A. Yes. Q. Where is that place? A. Southeast of town here. two miles. maybe two and a half. Q. When was that, that you had this conversation? A. Well, I don't just remember the date or anything about it, just let it slip my memory. Q. Was that deal closed? A. Yes, Mr. Dawson and his wife got in the car and came back to Mr. Glover's house, they did not trade then. they traded later on. Q. You know how they traded? A. No, I don't know. Q. Was there any agreement made with Mr. Dawson as to what commission you were to have? What agreement was made between you and Mr. Dawson? A. Well, the agreement was. I just asked him if he would sell his place, and I also told him that if he would and the

price was all right, I could furnish him a buyer. Q. You had no written agreement as to the commission you were to have? A. Never did with anybody. Q. You know what the customary fee as to real estate commission is in case where you have no special agreement? A. Five percent.

Upon cross-examination plaintiff testified:

"Q. You did not have any agreement to sell that place? A. Not only what he told me, 'bring the man out.' Q. You did not tell him at that time you were a real estate agent? A. No, I supposed he knew it. Q. As far as you know, he did not know it? A. I don't know what he knew. Q. You just met George on the street and said, 'George, will you sell that farm?' A. Yes. Q. He said 'Sell anything I have but the old woman?' A. I told him this. 'I think I can furnish you a buyer if your price is right.' Q. You did not ask him to list it with you? A. No. Q. He did not list that with you? A. No, only brought the man out, thought that was listing it. Q. Who did you take out there? A. Mr. Glover. Q. You were there when he bought it? A. No. Q. There when they agreed on the price? A. Well, I was there the day me and him went out there. Q. You said, 'Dawson, Mr. Glover wants to buy this farm?' A. I said, 'Mr. Dawson, I brought my man out.' Q. Mr. Glover asked him how much he'd take for that place? A. Yes, I believe $100. Q. Mr. Glover say he would pay it? A. No, he said he was not able to pay it. Q. Did Mr. Dawson tell you what he would take for the place when you talked to him on the street? A. No, he just said about $100. Q. He did not fix a price at which he would sell and authorize you to find a buyer able and willing to pay that price? A. No. Q. Not a thing said about you getting anything for making the sale? A. I never do, they have always paid me. Q. How long after the sale had been made to Mr. Glover before you said anything about collecting a commission? A. I don't just remember. Q. George had already moved into town and Glover had moved out there on the farm before you said anything about a commission to George? A. Yes, that is correct. Q. I believe you said in your direct testimony you found a place for Mr. Glover, and for some reason it was not delivered? A. Yes. Q. He want you to find him a farm? A. He said if I could get one located, he would try to buy it. Q. You worked for Mr. Glover? A. No, he said he would not pay me a commission Q. After George moved into town. you went to his place and asked him if he didn't think he ought to give you a commission? A. I went out there, and I said 'I thought I would come out here see you about the commission for selling your place.' George said he did not know he was paying any. said, 'You ought to have something.' Q. He said you ought to have it from him? A. No. He did not say from

him. Q. He didn't know you were looking to him for a commission, did he? A. I don't know exactly what he said then."

B. F. Glover, the party who traded for the land, testified with reference to the deal in part as follows:

"Q. How did you come to buy it, where did you get the information? A. Mr. Matlock told me he found a place if the price suited me might buy it. Q. Mr. Matlock worked for you? A. No, just took me out there and showed me two or three places. Q. He took you out there? A. We walked out there. Q. Your first and whole information about it being for sale came from Mr. Matlock? A. Yes. Q. Out of this transaction, this bringing you out there by Mr. Matlock, brought about the sale of the place to you? A. I suppose it did. Q. Could not have been any other way? A. No. Q. How many acres in the place? A. I bought 51 acres. Q. On what basis of value was that 51 acres sold to you? A. $3500, I traded the place on it. Q. Figured at $5,100? A. Yes."

Upon cross-examination the witness testified:

"Q. When you first went out there, Mr. Dawson wanted $100 per acre for that place? A. Yes. Q. That was more than you wanted to pay for it? A. Yes. More than I could pay for it. Q. Later, you traded him some town property and paid the difference in cash for 51 acres? A. Yes. Q. Mr. Matlock have anything to do with that? A. Not a thing. Q. Did you ever talk to him about that? A. No."

Witness Byers testified he was engaged in the real estate and insurance business, and that five per cent. commission was the usual custom and charge in the sale of real estate.

To such evidence on the part of plaintiff, the defendant demurred, and moved the court for an instructed verdict in his favor, which was denied, with exception.

The defendant testified, in substance, that plaintiff came to him and asked if he would sell the place where he lived, and he said, he would sell anything he had; that another party walked up, and that was about all that was said; that several days later plaintiff with the witness Glover came to his place when he was getting ready to come to town; that Glover wanted to look through his house, and he made inquiry as to price, but said he was unable to buy but maybe he would trade for it; that two or three weeks later he was in Glover's shoe shop and he traded a portion of the land to Glover. Fifteen or twenty days after, after defendant had moved to town, the plaintiff

came to his house and said, in referring to the trade, "I think I ought to have something out of this;" also later saw him down town when plaintiff said he thought he ought to have a little something out of that trade, "Pay me what you think I ought to have;" said he had known Mr. Matlock when he saw him for several years; not personally acquainted with him; did not know he was in the real estate business when he came to him on the street; thought he wanted to buy it himself; was under the impression that he was in the rooming house business; that the defendant did not have his farm on the market, never offered it for sale, would not have listed it with anybody.

Plaintiff alleged that the defendant employed him to find a purchaser for his land. If he recovers it must be under a contract, express or implied, in accordance with his pleading. King v. Stephenson, 29 Okla. 29, 116 Pac. 183; El Reno Wholesale Grocery Co. v. Keen, 93 Okla. 198, 220 Pac. 653. The rules which appear to us to be applicable in this case are stated as follows:

"As it takes two to make a bargain, a broker is not entitled to be compensated for his services unless they were rendered pursuant to the express or implied request of his employer. To warrant a recovery upon his part, he must have been actually employed by the person he is seeking to hold liable, for otherwise there would be no legal basis for his claim to compensation notwithstanding the fact that a purchaser may have been found through information furnished by him. The calling of a broker is not preferred in the eye of the law to that of other occupations, and he is no more entitled to remuneration for services voluntarily rendered without any employment, express or implied, than any other member of the community.,While a contract of employment may be implied from subsequent acts of ratification on the part of the alleged principal, to warrant the inference of a previous request, the owner must say or do something tending to prove that he accepted the broker as his agent in the matter—something more than merely selling to the party whom the broker, while acting as a volunteer, brought to him. Of course, the fact that a vendor accepts the benefits of a broker's efforts does not render him liable to the broker for commissions or in the theory of ratification, where he did not know that the broker was working in his behalf, but, on the contrary, the circumstances of the broker's endeavors indicated that he was working in the interest of the purchaser. * * * Furthermore, it is practically universally held that the mere asking and receiving the price of property does not of itself make the broker the agent of the owner, entitling him to commissions, although he finds a purchaser, or the owner

subsequently disposes of the property to one with whom the broker had negotiated." 4 R. C. L. p. 298, sectitn 43.

"To entitle the broker to commissions for his services, he must make it appear that the services were rendered under an employment and retainer by the principal, or that the latter accepted his agency and adopted his acts, under the circumstances reasonably indicating that the principal knew that the services had been rendered on his account and in reliance upon his obligation to pay for them If the broker rendered the services as a mere volunteer, without any employment, express or implied, he cannot recover commissions, even though he brought the parties together and was the efficient means of procuring the consummation of the bargain." Mechem on Agency, (2 Ed.) sec. 2426.

See, also, 9 Corpus Juris, pages 554-58.

"A real estate broker's right to remuneration for his services must be predicated on contractual relations existing between himself and the person against whom the alleged right is sought to be enforced. If he is unable to prove an express promise to pay for his services, he must show facts from which the law will imply a promise on the part of the alleged principal to compensate him for his efforts in the transaction in which he claimed to have been employed." Ludeman v. English, Ex'x, 78 Okla. 177, 189 Pac. 531.

"In order to raise an implied contract to pay for services (broker's) several things are necessary: First, the services must have been performed under such circumstances as to give the recipient thereof some reason to think they are not gratuitous, nor performed for some other person, but with the expectation of compensation from the recipient." Segnitz v. A. Grossenbach Co. (Wis.) 149 N. W. 159.

"In an action against a purchaser for a commission, where it was shown that the broker while expecting remuneration for his services from the purchaser depended on the latter's generosity, rather than on any contractual relations between them, it was held that, if disappointed in his expectation of payment, he could not recover the reasonable value of his services, there being no meeting of the minds in an intention that compensation for the services should be paid. Grant v. Von Alvensleben, 18 British Columbia 334, 25 West. L. Rep. 108."

See cases collected under note in Ann. Cases, 1918C, p. 1064.

There is no evidence of an express contract between the parties in this action, and considering the evidence in the light most favorable to the plaintiff, we fail to see wherein there is sufficient, under the rules of law applicable thereto, to establish an implied contract on the part of defendant to pay for the services rendered, or in warranting its submission to a jury.

This court has decided numerous cases relating to real estate broker's commission, but the majority of those involved the question as to whether the evidence was sufficient to show that the broker produced a buyer in accord with the terms and conditions of his listing, or whether his service was the procuring cause of the sale, a number of such cases being cited in the brief of defendant in error. In but few of such cases before this court do we find the question involved to be, whether or not plaintiff was employed by defendant, under an express or implied contract, as in the instant case. The evidence in the instant case is sufficient, as we view it, to show that plaintiff's acts were the procuring cause of the sale and exchange of the land, but the evidence and circumstances are otherwise wholly insufficient to establish and show that the defendant knew or had reason to believe plaintiff was rendering the service as his agent and in his behalf in reliance upon defendant's obligation to pay therefor.

We are not unmindful of the rule announced in the case of Harris v. Owenby, 58 Okla. 667, 160 Pac. 596, wherein it is said:

"In an action by a real estate broker to recover commission for the sale of real estate, where the evidence is conflicting as to whether the property was listed with the agent and whether his services were the procuring cause of the sale, this question should be submitted to the jury under proper instruction."

Where such rule is applicable, there must be sufficient evidence to warrant the court in submitting the issue to a jury, and the verdict thereon must be reasonably supported by the evidence. An equally well-established rule is stated in the case of McKinney v. Biggs, 96 Okla. 266, 220 Pac. 459, which involved recovery of real estate broker's commission, wherein it said:

"Where there is no evidence reasonably tending to establish a material issue submitted to the jury under the instruction of the court, which the jury must have found in favor of the prevailing party in order to have returned the verdict returned, the verdict will be set aside."

See, also, Bass Furn. & Carpet Co. v. Finley, 129 Okla. 40, 263 Pac. 130.

"Where there is no evidence offered by the complaining party which would reasonably tend to support a verdict for such party, it is not error for the trial court to direct a verdict for the defendant." Crandall v. Cousins, 104 Okla. 139, 230 Pac. 511.

We are reluctant to set aside the verdict of a jury, and would not do so were we not convinced, after a careful consideration of the entire record, that there is no evidence reasonably tending to support the same. We are of the opinion that the verdict and judgment rendered in the instant case are not supported by the law and evidence, and therefore the judgment must be reversed, and the case remanded, with directions to enter judgment in favor of the defendant.

TEEHEE, REID, HERR, and JEFFREY. Commissioners, concur.

By the Court: It is so ordered.